Mildred Serota, Appellee, v. Transportation Insurance Company of New York, Appellant.

Gen. No. 36,166.

Opinion filed April 11, 1933.

EKERN & MEYERS, for appellant; WILLIAM E. MOONEY and LUTHER F. BINKLEY, of counsel.

SUGARMAN & ROTHMAN, for appellee; SAMUEL D. ROTHMAN, of counsel.

Mr. Presiding Justice Scanlan delivered the opinion of the court.

Plaintiff sued defendant in assumpsit and in a trial by the court there was a finding for plaintiff and damages were assessed at $1,000. Judgment followed and defendant has appealed.

Plaintiff's statement of claim alleges that on November 21, 1929, defendant made its policy of insurance, and delivered it to plaintiff, whereby, in consideration of $20 paid by her, it insured her against all risks of loss or damage from any cause whatsoever, etc., to one Persian lamb coat, to the amount of $1,000, etc.; that at the time of the making of the policy and until the happening of the loss she had an interest in the property to the amount of the sum fixed in the policy; that on March 16, 1930, the property became lost or stolen, whereby she sustained damage to the amount of the policy. Defendant's affidavit of merits alleges, *inter alia,* that plaintiff procured the coat in Moscow, Russia, shortly prior to October, 1928; that it is composed chiefly of fur and is an article of wearing apparel; that during October, 1928, she unlawfully, and with intent to defraud the United States of the lawful import duty thereon, brought the coat within this country without declaring the same and without paying to the United States the import duty levied upon such article by section 1420 of Title 19 of the Revised Code of the United States and other sections applicable thereto; that plaintiff procured the policy of insurance on the coat without disclosing to defendant "the same to be contraband and so illegally and unlawfully imported aforesaid, to protect her against any supposed loss that she might suffer as a result of her unlawfully concealing and holding and receiving within the United States said coat as aforesaid. Wherefore, this defendant says that said coat became and was forfeited to and the property of the United States of America; that the

plaintiff had no lawful interest therein and that the court should not permit itself to be used as an instrumentality to enforce such an alleged contract which is contrary to public policy and void.''

The cause was submitted to the court upon a stipulation of facts containing the following:

"That, shortly prior to October 26, 1928, plaintiff . . . was visiting in Moscow, Russia, and plaintiff's sister gave her as a present a genuine Persian Lamb coat, then of the value of $1,000; that . . . Persian lamb is a fur within the meaning of the laws of the United States . . . respecting import duties on fur coats, and that said coat was composed, (except for the lining and buttons) entirely of said Persian Lamb, and constituted wearing apparel.

"That the plaintiff brought the . . . coat into the United States of America on or about October 26, 1928, . . . through the port of New York; that prior to that time the said coat had not been in the United States, nor had it originated in the United States or been made therein; that plaintiff wore said coat on her person at the time of bringing same through said port.

"That in bringing the said coat into the United States . . . the plaintiff did not, nor did anyone for her or on her behalf, declare the said coat at the United States customs at the port of New York, on her arrival, or at any other port,—nor did the plaintiff, or anyone for her or on her behalf, pay to the United States . . . any duty or duties that may or might be lawfully due on the import of the said coat into the United States, nor did she pay any duty on said coat from thence hitherto.

"That on or about November 21, 1929, . . . defendant, . . . issued and delivered to plaintiff, in consideration of $20 as premium, its certain policy of insurance, . . . by which it insured the plaintiff until noon of November 21, 1930, against all risks of

loss or damage from any cause whatsoever . . . on the said . . . coat . . . in the amount of $1,000 . . .

"That the defendant is reserving to itself the sole defense that at the date of the issuance of the policy of insurance and at the date of the loss of said coat, the plaintiff did not have an insurable interest in the said fur coat by reason of the fact that she had brought it unlawfully into the United States of America without declaring it to the United States customs, or paying an import duty thereon.

"It is agreed that the . . . defendant . . . did not know, prior to the loss of the said coat, that the said coat had been brought into the United States of America without the payment of import duties thereon.

". . . that the plaintiff herein did not know prior to the loss of said coat that she was required (if she was so required) to declare and pay any duty on said fur coat at the time of bringing said coat into the United States of America.

". . . that the value of said coat on the date it was lost or stolen was $1,000."

Plaintiff's theory is that "the title of the owner of property as to which an act of forfeiture has been committed under the revenue laws, is not divested *eo instanti* upon the commission of the offense, but by the judgment or decree of a court having jurisdiction in the premises, ascertaining and declaring the forfeiture"; that state courts cannot try the question of forfeiture under the revenue laws, collaterally; that defendant cannot urge a defense of forfeiture under the United States revenue laws, except by evidence of a decree of condemnation, determining the existence of such forfeiture; that the fur coat was the property of plaintiff during the entire term of the policy sued on; that she had an insurable interest therein, and that the contract of insurance sued on was not against public policy. Defendant's theory is that when plaintiff

brought the coat into the United States without paying the duty due on the same, an absolute forfeiture, under the statute applicable to the instant case, took place, and the title to the coat from that moment vested in the United States; that she had no right of property nor insurable interest in the coat thereafter, and "that it is against public policy to permit insurance on smuggled goods"; that under the stipulation of facts and the provisions of par. 1420, sec. 121, Title 19, Customs Duties, United States Code, 1928, the coat was subject to "50 per centum *ad valorem*" duty.

The following sections are found in the revenue laws of the United States, Title 19, Customs Duties, U. S. Code, 1928:

"Sec. 506. Seizures. It shall be the duty of the several officers of the customs to seize and secure any vessel or merchandise which shall become liable to seizure by virtue of any law respecting the revenue, as well without as within their respective districts.

"Sec. 509. Same; Report and Delivery of Vessel or Property to Collector; Report of Violations.—It shall be the duty of any officer, agent, or other person authorized by law to make seizures of merchandise or baggage subject to seizure for violation of the customs laws, to report every such seizure immediately to the collector for the district in which such violation occurred, and to turn over and deliver to such collector any vessel, vehicle, merchandise, or baggage seized by him, and to report immediately to such collector every violation of the customs laws.

"Sec. 513. Same; Appraisement of Seized Property. The collector shall require the appraiser to determine the domestic value, at the time and place of appraisement, of any vessel, vehicle, merchandise, or baggage seized under the customs laws.

"Sec. 514. Same; Notice of Seizure, Forfeiture, and Sale Where Value $1,000 or Less. If the value of such vessel, vehicle, merchandise, or baggage returned

by the appraiser, under section 513 of this title, does not exceed $1,000, the collector shall cause a notice of the seizure of such articles and the intention to forfeit and sell the same to be published for at least three successive weeks in such manner as the Secretary of the Treasury may direct.

"Sec. 515. Same; Claims to and Condemnation of Seized Property. Any person claiming such vessel, vehicle, merchandise, or baggage may at any time within twenty days from the date of the first publication of the notice of seizure file with the collector a claim stating his interest therein. Upon the filing of such claim, and the giving of a bond to the United States in the penal sum of $250, with sureties to be approved by the collector, conditioned that in case of condemnation of the articles so claimed the obligor shall pay all the costs and expenses of the proceedings to obtain such condemnation, the collector shall transmit such claim and bond, with a duplicate list and description of the articles seized, to the United States attorney for the district in which seizure was made, who shall proceed to a condemnation of the merchandise or other property in the manner prescribed by law.

"Sec. 516. Same; Sale of Unclaimed Property. If no such claim is filed or bond given within the twenty days specified in section 515 of this title, the collector shall declare the vessel, vehicle, merchandise, or baggage forfeited, and shall sell the same at public auction in the same manner as merchandise abandoned to the United States is sold, and shall deposit the proceeds of sale, after deducting the actual expenses of seizure, publication and sale, in the Treasury of the United States.

"Sec. 517. Same; Condemnation Proceedings Where Value Exceeds $1,000. If the value returned by the appraiser of any vessel, vehicle, merchandise, or baggage so seized is greater than $1,000, the collector shall transmit a report of the case, with the names of

available witnesses, to the United States attorney for the district in which the seizure was made for the institution of the proper proceedings for the condemnation of such property.''

Defendant contends that this case is governed by section 497, Title 19, which reads as follows:

''Sec. 497. Fraudulently or Knowingly Importing or Assisting in Importing Merchandise; Buying, Selling, Transporting, or Concealing Unlawfully Imported Merchandise; Punishment. If any person fraudulently or knowingly imports or brings into the United States, or assists in so doing, any merchandise, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, *such merchandise shall be forfeited* and the offender shall be fined in any sum not exceeding $5,000 nor less than $50, or be imprisoned for any time not exceeding two years, or both. . . .'' (Italics ours.)

Defendant directs our attention to the italicized words in that section and contends that when plaintiff imported the coat into the United States without paying the duty thereon, the absolute title to the property was vested in the United States from the moment of the offense, and she no longer had any property nor insurable interest in the merchandise. Section 497 relates to the punishment of offenders who fraudulently or knowingly bring into the United States, or assist in so doing, any merchandise contrary to law, and it does not determine nor control the question before us. Indeed, by the stipulation of facts ''it is agreed that the plaintiff herein did not know prior to the loss of said coat that she was required (if she was so required) to declare and pay any duty on said fur coat at the time of bringing said coat into the United States.''

In support of its contention that at the moment of the offense the absolute title to the coat vested in the United States and plaintiff no longer had any property nor insurable interest in the coat, defendant cites *United States v. 1960 Bags of Coffee,* 12 U. S. (8 Cranch) 398; *Gelston v. Hoyt,* 16 U. S. (3 Wheat.) 246, 311; *Henderson's Distilled Spirits,* 81 U. S. (14 Wall.) 44. The first case was an appeal from the sentence of the circuit court for the district of Maryland, which restored a quantity of coffee which had been seized and libeled for a violation of the non-intercourse act effective March 1, 1809. The claimants in the court below alleged, by way of plea, that the coffee was regularly entered and the duties secured according to law, after which they became the purchasers for valuable consideration. They also denied that it was imported contrary to law. The Supreme Court, in a very short opinion, held a forfeiture of goods for violation of the act in question takes place upon the commission of the offense and avoids a subsequent sale to an innocent purchaser. The case is unusually interesting because the decision had the effect of reversing a decision of Justice Story in the case of *United States v. The Brigantine Mars,* ib. 417, and that able justice saw fit to "introduce" in the former case his exhaustive opinion in the *Mars* case, to which he added the statement that he was "not yet satisfied of its incorrectness." In the *1960 Bags of Coffee* case the contest was over the right of possession of certain coffee, and in the *Mars* case, over the right of possession of the Brigantine Mars. In *Henderson's Distilled Spirits, supra,* it appears that the government seized 100 barrels of distilled spirits and an information was then filed by the district attorney. Henderson "appeared to the monition issued on the information and claimed the spirits as owner." The district court gave judgment for the claimant and the circuit court affirmed the judgment. During the pendency of the legal proceed-

ings the collector held the spirits in his possession and custody as forfeited to the United States under the act in question. In its opinion the Supreme Court held (pp. 56–7) :

"Where the forfeiture is made absolute by statute the decree of condemnation when entered relates back to the time of the commission of the wrongful acts, and takes date from the wrongful acts and not from the date of the sentence or decree. *Roberts v. Witherall,* 1 Salkeld, 223; *Robert v. Witherhead,* 12 Modern, 92; *United States v. Bags of Coffee,* 8 Cranch, 398; *The Brigantine Mars,* Ib. 417; *Gelston v. Hoyt,* 3 Wheaton, 311; *Caldwell v. United States,* 8 Howard, 381; *United States v. Grundy,* 3 Cranch, 338; *Wood v. United States,* 16 Peters, 342; *Clifton v. United States,* 4 Howard, 248. Subsequent payment of the duties, therefore, is no defence to an information for a forfeiture founded upon antecedent wrongful acts, as the effect of such wrongful acts, where the forfeiture is made absolute by statute, is to divest the owner of all property in the goods seized and to vest the title to the same in the United States, *in case a prosecution ensues, and a decree of condemnation follows, as the decree of condemnation when entered by a court of competent jurisdiction relates back to the date of the wrongful acts as alleged and proved at the trial or in the hearing of the cause. Fontaine v. Ins. Co.,* 11 Johnson, 293; *Kennedy v. Strong,* 14 id. 128. Repeated decisions of this court have established that rule in all cases where the forfeiture is made absolute by the ·act of Congress, and it necessarily follows that neither the subsequent payment of the duties nor the fact that the defendant is an innocent purchaser, without notice of the wrongful acts of the antecedent owner, constitutes any defence to the charge contained in the fourth article of the information. *Wilkins v. Despard,* 5 Term, 112. Many such adjudged cases are to be found in the reported decisions of this court, and it must be admitted that

they establish the rule beyond all doubt, that the forfeiture becomes absolute at the commission of the prohibited acts, and that the title from that moment vests in the United States in all cases where the statute in terms denounces the forfeiture of the property as a penalty for a violation of law, without giving any alternative remedy, or prescribing any substitute for the forfeiture, or allowing any exceptions to its enforcement, or employing in the enactment any language showing a different intent; and that in all such cases it is not in the power of the offender or former owner to defeat the forfeiture by any subsequent transfer of the property even to a *bona fide* purchaser for value without notice of the wrongful acts done and committed by the former owner.'' (Italics ours.)

In *Gelston v. Hoyt, supra,* the court states (pp. 312–3):

''This is a seizure for a forfeiture under the laws of the United States, and consequently, the right to decide upon the same, by the very terms of the statute, exclusively belongs to the proper court of the United States; and it depends upon its final decree, proceeding *in rem,* whether the seizure is to be adjudged rightful or tortious. If a sentence of condemnation be pronounced, it is conclusive, that a forfeiture is incurred; if a sentence of acquittal, it is equally conclusive against the forfeiture; and in either case, the question cannot be litigated in another *forum.* This was the doctrine asserted by this court, in the case of *Slocum v. Mayberry* (2 Wheat. 1), after very deliberate consideration; and to that doctrine we unanimously adhere. The reasonableness of this doctrine results from the very nature of proceedings *in rem.* All persons having an interest in the subject-matter, whether as seizing officers, or informers, or claimants, are parties, or may be parties, to such suits, so far as their interest extends. The decree of the court acts upon the thing

in controversy, and settles the title of the property itself, the right of seizure, and the question of forfeiture.''

In *United States v. Stowell*, 133 U. S. 1, the court said (pp. 16–7):

''By the settled doctrine of this court, whenever a statute enacts that upon the commission of a certain act specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act; the right to the property then vests in the United States, *although their title is not perfected until judicial condemnation; the forfeiture constitutes a statutory transfer of the right to the United States at the time the offence is committed; and the condemnation, when obtained, relates back to that time, and avoids all intermediate sales and alienations, even to purchasers in good faith.* The rule was early applied under statutes enacting that whenever goods, the importation of which was prohibited, should be imported, they should be forfeited; and that if any ship should leave port without clearance or giving bond as required by law, the ship and the cargo should be forfeited. *United States v. Coffee,* 8 Cranch, 398; *The Mars,* 8 Cranch, 417. It has been recognized and acted on in cases of goods imported in fraud of the customs laws. *Gelston v. Hoyt,* 3 Wheat. 246, 311; *Wood v. United States,* 16 Pet. 342, 362; *Caldwell v. United States,* 8 How. 366. And it has been steadfastly upheld under the internal revenue laws; in one case, under an enactment punishing by fine and imprisonment any person removing distilled spirits from the distillery contrary to law, with intent to evade the payment of the tax thereon, and providing that spirits so removed should be forfeited; and in another case under an enactment that any person fraudulently executing an instrument required by the internal revenue laws should be punished by fine and imprison-

ment, and the property to which the instrument related should be forfeited. *Henderson's Distilled Spirits,* 14 Wall. 44; *Thacher's Distilled Spirits,* 103 U. S. 679." (Italics ours. See also *Roma v. United States,* 53 F. [2d] 1007, 1008.)

It is conceded that the coat was never seized by the United States, and there is no proof, competent nor incompetent, that proceedings of any kind were ever commenced by the government in reference to it, and, under the authorities, the title of the United States to the coat was never perfected. It is the settled rule "that when the act has been done which the law declares to work a forfeiture of the property, the right of the government to seize the property, and assert the forfeiture, attaches at once and may be pursued by the government whenever and in whose hands soever that property may be found. See *Henderson's Distilled Spirits,* 14 Wall. 44." (*Thacher's Distilled Spirits,* 103 U. S. 679, 682.) It is equally true that the government may, in apt ways, enforce its claim against plaintiff for nonpayment of the duty. We may add, it is not even clear from the record before us that the government may not have considered the coat exempt from duty under certain provisions of the revenue law. (See *Astor v. Merritt, Collector,* 111 U. S. 202.)

In support of its further contention that plaintiff should be held to have no insurable interest in the coat defendant relies upon *Fontaine v. Phoenix Ins. Co.,* 11 John. (Sup. Ct. of N. Y., 1814) 293, wherein it was held that if the owner of the schooner Phoenix breached the nonintercourse law of the United States passed March 1, 1809, the vessel would be forfeited and the property immediately vest in the United States, and the owners would have no insurable interest in the vessel. This case grew out of an alleged violation of what amounted to practically a war measure. During the proceedings counsel for plaintiff stated that he was

taken by surprise by the defense of forfeiture and he seems to have raised no objection to such defense but informed the court that, possibly, if he had not been surprised he might have shown facts to controvert the allegation of forfeiture. That he made no objection to the manner in which the defense was raised, nor to the jurisdiction of the state court to determine the question of forfeiture, is clear. The court, in deciding the case, relied upon *Wilkins v. Despard,* 5 Term R. 112, but the Supreme Court of the United States, in *Gelston v. Hoyt, supra,* held that the courts of the United States have an exclusive cognizance of questions of forfeiture and that *Wilkins v. Despard* was not an authority to the contrary. None of the decisions in the United States courts would support the ruling in the *Fontaine* case, and later decisions of the New York courts, hereafter cited, run counter to it. Defendant claims that the rule in the *Fontaine* case, in reference to insurance, was later followed in *Amory v. M'Gregor,* 15 John. (Sup. Ct. of N. Y., 1818) 24, but the court in that case states that under the facts there was a distinction between the two cases and that the declaration of war virtually repealed and annulled the nonintercourse act that governed the *Fontaine* case, and therefore the ruling in that case was not applicable. In *Wilkes v. People's Fire Ins. Co.,* 19 N. Y. (Ct. of Appeals, Smith 5, 1859) 184, the court questioned the justice of the rule in the *Fontaine* case, saying (pp. 187–8) :

"It is said that if we should hold the vessel forfeited, we are controlled by the case of *Fontaine v. The Phoenix Insurance Company* (11 John., 297), as to the point that the defendant (an insurance company) may avail itself of forfeiture, if there was one, by way of defence. The section declares the vessel forfeited, it is true; but I am not able to see the justice of permitting a third party to set it up to defeat a fair con-

tract on its part, the consideration for which it has been allowed to receive and appropriate.''

In *Tracey v. Corse,* 58 N. Y. 143, the plaintiff claimed title to a barge, as purchaser at a sale at public auction made by the collector of internal revenue, by whom the barge had been seized for an alleged forfeiture incurred under the internal revenue law of the United States, in that the barge at the time of seizure was fitted up and used in the business of the illicit manufacture of spirits. The defendant claimed to derive title from the person who owned the barge when the seizure was made. The act in question provided ''that the same shall be forfeited to the United States.'' The court said (p. 149):

''It is to be assumed, in view of the proof offered on the trial and rejected, that the barge was liable to forfeiture when the seizure was made, and that the seizure was lawful. But the title of the owner of property as to which an act of forfeiture has been committed under the internal revenue laws, is not divested *eo instanti,* upon the commission of the offence, or by the seizure, but by the judgment or decree of a court having jurisdiction in the premises, ascertaining and declaring the forfeiture. It is true, that the statute declares that property, under certain circumstances, shall be forfeited, but it also provides that proceedings to enforce the forfeiture shall be taken in the courts of the United States. Whatever may be the true view as to the time when the forfeiture takes place, it is by the judgment alone that it can be ascertained and determined. If the government may be deemed to have an inchoate title from the time the offence is committed, it is not consummated until after a judicial condemnation. And, if after a seizure the possession is abandoned by the government, and a decree of forfeiture is not obtained, the title and the right of possession is in the original owner. This is, I think, a fair deduction from the authorities. (*Slocum v. Mayberry,* 2 Wheat., 1; *Gel-*

*ston v. Hoyt,* 3 id., 246; *U. S. v. Grundy,* 3 Cranch, 350; *Same v. 1960 Bags of Coffee,* 8 id., 398; *Caldwell v. U. S.,* 8 How., 366–381.)"

In *Stark v. Grant,* 16 N. Y. S. 526, the court followed *Tracey v. Corse, supra,* and stated: "But the goods were the property of plaintiff, except as against the United States, and as to the United States, even, they continued his property until judgment of forfeiture duly rendered." In *Mitchell v. Cunningham,* 29 Me. 376, it appeared that a vessel, with certain goods, was seized and libeled on the ground that she had been employed in a business not justified by the fishing license. Afterward the owner and commander of the vessel filed in the United States District Court a petition admitting the forfeiture and praying that it might be remitted. "Due proceedings being had, the forfeiture was remitted . . . under the hand and seal of the secretary of the treasury. Afterwards the secretary revoked the remittitur, and ordered that it should be returned to him, and that the property should be withheld from Barnes. Barnes insisted upon having the property restored, and denied that the secretary could revoke the remittitur. The question was presented before the District Judge, who decided that the goods should be restored to Barnes, and that the libel should be dismissed, and that a writ of restitution should issue, which was accordingly issued. From this decree and these proceedings the United States appealed to the Circuit Court of the United States, where, upon a full hearing, the decree of the District Court was affirmed. . . . While the goods were in custody of the law, under the seizure by the collector as above named, Barnes mortgaged the goods to the plaintiffs, to secure their purchase money. And the mortgage was duly recorded." In its opinion the Supreme Court of Maine said (382–5):

"When a vessel or goods have become forfeited by a breach of the revenue laws, they must generally be

libeled and the suit prosecuted in the Court, having cognizance thereof. The mode of proceeding to final judgment of condemnation or restoration is prescribed by law, for the alleged forfeiture in the present case. Acts of Congress of Feb. 18, 1793, c. 52, secs. 6 and 35, and of Aug. 4, 1790, c. 62, sec. 67. Although the liability to forfeiture takes place upon the commission of the offence, the title of the government, when goods are required to be libeled, does not become perfected until there is a judgment of condemnation. *The Margaretta*, 2 Gall. 522; *United States v. Palo Alto*, 3 Wood. & Minot. Where the right of a party depends upon its establishment in a court of record, by a prosecution directed by statute, such right is not attained, unless the prescribed course is followed. *Fire Department v. Kipp*, 10 Wend. 266. In the present case, the government had an inchoate right to the property, arising from the violation of the law, if such were the fact, and could make that right absolute, if there were no laches in its officers, and the claim were duly prosecuted. The title cannot therefore be said to be conclusively and entirely fixed by the offence, until the condemnation. The legal proceedings constitute the only effectual mode of determining whether the forfeiture has accrued. . . . Between Barnes and third persons, the property was his, at the time of making the mortgage, subject to the claim of the government. Between him and the government, if there had been an offence creating a forfeiture, a right in the latter to the property was to be consummated only by a prosecution, and a final decree in its favor. . . . Whatever interest Barnes had in the property, he could transfer by a sale. And if he could sell it, subject to the claim of the government, there does not appear to be any reason why he could not mortgage it. If he could make an absolute, he could also a conditional sale.''

In *Polleys v. Ocean Ins. Co.*, 14 Me. 141, the plaintiff sued the defendant on a policy of insurance, bearing

date July 17, 1833, upon a schooner called the Mary, owned by the plaintiff, which was totally lost on June 10, 1834. It appears that a sloop was built in 1816, which was enrolled in the customs house by the name of Sophronio, and again so enrolled in 1832; that the schooner was built upon the keel of the sloop "but that the enrollment of the sloop Sophronio was not first surrendered and delivered up at the Custom House before the issuing of the enrollment of the Mary, which was on the third day of June, 1833"; that at the time an act of Congress pertaining to the registry and the recording of ships and vessels provided, "that if any certificate of registry or record shall be fraudulently or knowingly used for any ship or vessel not then actually entitled to the benefit thereof, according to the true intent of this act, such ship or vessel shall be forfeited to the United States." The defendant contended that the policy gave no right of action to the plaintiff, because insurance on a vessel subject to forfeiture for violation of the laws of the United States is void. In its opinion the court said (pp. 150–1):

"It would be very detrimental to the commerce of the country to hold, that a vessel was not the subject of a lawful insurance because she was liable to seizure and forfeiture for a cause not connected with the policy. The laws of the United States contemplate, that vessels are thus liable for causes arising without wilful negligence or intention of fraud. Cases of that kind are not of unfrequent occurrence, and the Secretary of the Treasury is authorized by law to remit the forfeiture. It could never have been the design of the statute under such circumstances to destroy the legal title, or lawful right of employment, until the forfeiture was exacted. The risk is not increased, nor is the loss for such cause within the policy. The assurers cannot place themselves in the situation of the government, and claim to act for it. None can claim a forfeiture, but those authorized by law. Nor can this matter be properly

tried collaterally, and by a Common Law Court. The jurisdiction belongs to another tribunal. It is a matter between others, in which the defendants are not interested, and with which they have no concern.''

After giving, the questions raised on this appeal serious consideration we are satisfied that plaintiff had an insurable interest in the coat. We may add that the contention of defendant that it would be against public policy to allow plaintiff to prevail in the instant case, is without the slightest merit. The government is not powerless to assert any rights it may have against plaintiff, growing out of the act in question.

The judgment of the municipal court of Chicago is affirmed.

*Affirmed.*

GRIDLEY and SULLIVAN, JJ., concur.